OPINION OF THE COURT
C. Raymond Radigan, J.
This motion by former adoptive parents who had moved to *706 Macon, Georgia, during the adoption proceeding seeks to vacate an ex parte order of this court dated January 3, 1991, which dismissed the adoption proceeding. The order issued after petitioners returned the adopted child to New York, leaving her at the home of a woman who was said to be interested in adopting her and their returning to their home in Georgia.
The former adoptive parents, Emmanuel and Linda, received custody of the child on August 16, 1989, approximately two months after the child’s birth, and filed a petition for adoption in this court on August 21, 1989. The former adoptive father is an ophthalmologist and his wife a registered nurse. Shortly after filing the petition for adoption, the family moved to Macon, Georgia.
By decision of June 13, 1990, this court retained jurisdiction of the matter and also determined that the Interstate Compact on the Placement of Children (Social Services Law § 374-a), which controls the transportation of children across State lines for the purpose of adoption, did not apply since the child had been properly placed with adoptive parents in New York, and they were not prevented by the compact from thereafter moving out of one State into another following the commencement of their adoption proceeding.
In order to insure that the consents of natural parents are informed and knowledgeable, the court has adopted a local rule requiring that natural parents be represented by counsel appointed by the court at the expense of the adoptive parents. On August 17, 1989, pursuant to that policy, the court assigned an attorney to represent the unwed natural parents of the child and thereafter fixed the fee of the attorney for the natural parents in the amount of $750. The petitioners state that they were thereafter advised by their attorney to pay the $750 legal fee. They state they had no previous knowledge of that requirement and found it "morally offensive in that it seemed to us to be baby buying”. Presumably it was this primary factor which caused them on December 27, 1990 to return the child to New York and leave her with a Ms. Wilson who was said to be interested in adopting the child. Upon gaining knowledge of this incident, the court, sua 'sponte, and without notice to any of the parties, by order of January 3, 1991 dismissed the adoption proceeding, transferred custody of the child to the Department of Social Services (DSS) and transferred the matter to the Nassau County Family Court pursuant to Domestic Relations Law § 116. Shortly after re *707 turning to Georgia, the petitioners in a series of communications by letter and telephone requested the return of the child. Thereafter, DSS commenced a proceeding in the Family Court for custody of the child on notice both to Ms. Wilson and the petitioners designated as "previous unrelated custodians.” The petitioners state that they "learned” that a proceeding was being brought in Family Court and Linda traveled to New York to appear in that proceeding on both February 27 and March 13, 1991, at which time she informed the Family Court Judge that they were still desirous of adopting the child. At her second appearance she alleges the Family Court Judge told her that he was going to grant the application of DSS for custody of the child in order to provide for her continuous care which he did by order of March 13, 1991, but told her that they should apply to DSS to readopt the child and to this court to vacate its order of January 3, 1991. Linda states that she thereafter met with a social worker at DSS but was allegedly discouraged from applying to adopt the child because it was stated it would only be denied. In a letter addressed to the petitioners, in response their letter of March 29, 1991 addressed to him, the Commissioner of DSS states in part:
"Although we sympathize in that you may regret decisions made in December of last year, we are nevertheless compelled to follow directives and procedures mandated by New York State Social Services Law and the corresponding State Regulations.
"Due to circumstances set in motion following your return to New York with this child on December 27, 1990, our Department’s overriding obligation has been to provide for the permanent future and best interests, needs, and rights of this child. Accordingly, this child, already freed for adoption, was placed in a prospective adoption home and an adoption agreement was executed. Because of this, we would now be unable to consider your application to become an adoptive resource for this child.
"Upon review of your position, the Hon. Burton S. Joseph of the Family Court, Nassau County, approved this Department’s placement of the child in foster care. In addition, the Hon. C. Raymond Radigan, Surrogate of Nassau County, dismissed your adoption petition and placed custody of the child with the Commissioner of Social Services.
"It is in the judgment of those involved that it would be best to avoid further uprooting and disruption of this child’s life so *708 that she may begin to grow up. in a normal family life in a permanent home.”
In May of 1991, the petitioners commenced a proceeding in the Nassau County Supreme Court to compel the production of all relevant records in the files of both the Surrogate’s and Family Courts and DSS. In June of 1991, they brought a CPLR article 78 proceeding, seeking to vacate the order of January 3, 1991 of this court, the order of March 13, 1991 of the Family Court, and directing this court to grant an order of adoption and the surrender of custody of the child by DSS to the petitioners. On September 12, 1991, the Supreme Court granted the respondents’ motion to dismiss the petition and denied the petitioners’ cross motion to stay the respondents from proceeding with any placement or adoption of the child. The court observed that the January 3, 1991 order of this court, while not directly appealable (CPLR 5701 [a] [3]) could be the subject of a motion to vacate in the Surrogate’s Court. Following the dismissal of that proceeding, the present application to vacate the January 3, 1991 order was commenced in this court.
The primary difficulty the petitioners say they faced was to pay the $750 fee which they considered morally objectionable since it smacked of baby buying and was contrary to an affidavit which they had signed. While Social Services Law § 374 (7) prohibits anyone except an authorized agency from accepting or receiving any compensation in connection with the placing out or adoption of a child, it specifically does not prevent the payment by a person with whom a child has been placed out of reasonable and necessary expenses of the mother in connection with the birth of the child nor “reasonable and actual legal fees charged for consultation and legal advice, preparation of papers and representation and other legal services rendered in connection with an adoption proceeding or of necessary disbursements incurred for or in an adoption proceeding.” Therefore even though the petitioners may have considered the payment morally objectionable, it was not as such unlawful or against public policy in New York State. Moreover, as previously mentioned, pursuant to local rule adopted by this court, it has required natural parents to be fully represented in order to protect their interest and has charged that fee to the adoptive parents as an additional disbursement.
Finally, the problem with regard to the payment of the $750 fee resulted in such an impasse that the petitioners’ then *709 attorney agreed by letter of November 6, 1990 to absorb the fee upon the payment of the balance of her agreed-upon fee. The letter reads in part:
"When I discuss fees with a client, it is my usual practice to inform clients that there may be other costs and disbursements that arise during the course of a proceeding for which they will be responsible. It is my recollection that I advised you of this fact. However, in order to give you the benefit of the doubt, I am willing to * * * make payment out of my fee to cover the fee for the court-appointed attorney for the natural parents. This will be done with full disclosure to that lawyer and to the Surrogate.
"Please advise if you still wish to surrender the child.”
By letter of November 21, 1990, the petitioners acknowledged receipt of both of their attorney’s letters dated in November of 1990 and enclosed the final payment of her fee as requested. The concluding paragraph states in part, "Additional costs are a problem for us as explained to you. If the courts believe that monies should not be a concern, then by the same token why couldn’t the fees be waived? This seems like a convenient doudle [sic] standard to me or maybe because my husband is a physician, they see dollar signs.”
Petitioners obviously knew well in advance of the return of the child to New York on December 27, 1990 that their attorney had agreed to absorb the $750 disbursement. Being somewhat doubting Thomases, this distinct representation by their very own attorney was apparently not enough to convince the petitioners that in fact the attorney would take care of the matter. In their present papers they complain that their attorney did not in haec verba explicitly tell them that she had taken care of the fee before they returned the child to New York. However, in a January 8, 1991 letter to them, their attorney states in part: "I am very puzzled by Dr. [Emmanuel’s] letter of January 3, 1990. I previously advised that I would take responsibility for payment of the court appointed attorney, and I have done so. This is not an issue any more. However, you came to New York and voluntarily surrendered the baby. You were never asked to do so. Now that you have done so, the Surrogate has transferred custody to the Department of Social Services and as far as the Surrogate is concerned, the file is closed.” In a letter to the court dated January 14, 1991, they state in part: "We are regretful that neither the Clerk of the Court * * * nor our attorney *710 * * * advised us properly or even appeared to care about our misgivings based on our belief. We spoke with [our attorney] four [4] times between 11/28/90 and 12/29/90 and she never once told us that the fees for the court-appointed attorney were paid. This one material fact would have made all the difference. ”
In the opinion of the court, it is a fair assumption from the quoted portions of petitioners’ letter of November 21, 1990 to their attorney and the January 14, 1991 letter to the court that the problem over the $750 disbursement was more a concern of who paid it rather than why.
In addition, the petitioners complain that they were in a quandry over whether they had in fact legal custody of the child since they were told by several legal authorities in Georgia that they did not have such custody and that she could be removed from their home at any time. Of course, this is contrary to their own letter of March 7, 1991 addressed to the court, in which they say, "According to our attorney * * * 'If you don’t pay the fees the courts say they are going to have the people in Georgia investigate and take the child.’ This we investigated with Georgia DEFACS and they assured us that they would not and could not do that unless [the child] was being neglected hence we dismissed [our attorney’s] statement as meant to intimidate.” From their own letter it therefore appears they were not "intimidated,” contrary to what they now contend.
Moreover, the petitioners did actually have legal custody of the child. Social Services Law § 374 (2) provides that no person or agency shall place out any child, but such provisions shall not restrict or limit the right of any parent, legal guardian or relative within the second degree to place out a child for adoption. Accordingly, the placement by the natural parents here was entirely lawful and permitted by statute. The petitioners’ assertion that the court failed to grant temporary guardianship to them as required by law is inaccurate. Domestic Relations Law § 115-c provides that in any case where physical custody of a child is transferred from the parents to another person for adoption and a consent to the adoption executed, the adoptive parents shall within 10 court days of taking physical custody either file a petition for adoption or an application for temporary guardianship of the child pursuant to the above section and SCPA 1725. Here the adoption petition was filed within 10 days after receiving custody, and accordingly there was no necessity for the filing of an applica *711 tian for temporary letters of guardianship. The professed fears of the petitioners that this court would never grant them an adoption because of their alleged uncooperativeness is startlingly inconsistent with the stream of correspondence to the court initiated almost immediately following the return of the petitioners to Georgia requesting the return of the child and the granting of the adoption. Obviously those letters were sent with the assumption that the relief requested would or could follow.
The petitioners also attack the actions of this court, in dismissing the adoption proceeding without notice to them, granting custody to DSS and referring the matter to the Family Court. They also challenge the validity of the placement with DSS by the Family Court. Domestic Relations Law § 116 (2) provides that should the adoption investigation give apparent cause, the Surrogate shall require the petitioners to show cause "why the child should not be removed from the home, upon due notice to all persons whose consent is required for the adoption”. On the return day the court "shall take proof of the facts shown by any such investigation. If the court is satisfied that the welfare of the child requires that it be removed from the home, the judge or surrogate shall by order remove the child from the home of * * * petitioners and * * * in the case of a surrogate, transfer the child to the family court.” (Domestic Relations Law § 116 [2].)
The section in effect requires notice to the adoptive parents to show cause why the child should not be removed from their custody. Here, at the time the court issued its sua sponte order of January 3, 1991, physical custody of the child had already been surrendered by the adoptive parents to a person said to be interested in adopting it, and accordingly the court concluded that under those emergency circumstances, no further notice was required to the petitioners. With regard to notice to the natural parents, their consents to the adoption specifically state that they do not wish to be contacted or notified again concerning the adoption or any other adoption of the child, and that they waive all further notice and citations in respect to the proceeding.
Once the matter was properly transferred to the Family Court there is no question that court had the authority to place the child with DSS. The procedure adopted by the Family Court was to accept a placement request from Ms. Wilson to place the child in the care and custody of DSS and an order to that effect was granted pursuant to Social Services *712 Law § 358-a. However, it would appear that the Family Court could just as easily have concluded that the child was "destitute or homeless” pursuant to Social Services Law § 371 (3) (a), and as a result have thereby placed the child with DSS. In Matter of Anonymous v Olson (112 AD2d 299), persons who had taken children into their home after the children’s mother was murdered and the father convicted of murder instituted custody proceedings in the Family Court, which required DSS to be joined as copetitioner to which the individual petitioners objected. The court noted that the award of custody to the Commissioner was entirely proper and that the record amply supported the conclusion that the children were " 'homeless [and] destitute’ ”, citing Social Services Law § 371 (at 300).
In Matter of Spath v Willis (71 AD2d 489), a child had been surrendered to DSS by the natural mother and placed with adoptive parents who thereafter experienced marital difficulties, separated and left the child with baby-sitters. DSS then commenced a proceeding under section 651 of the Family Court Act for return of the child, and the baby-sitters countered with their own custody application. The court observed that since the adoptive parents were unable to discharge their obligation to the infant, the Department had not only the right but the duty to petition for return of the child pursuant to Family Court Act § 651, and its efforts should in no way have been stayed by the Supreme Court by reason of the babysitters’ application for custody.
Unquestionably the Family Court had jurisdiction to act in this emergency situation. The State as "parens patriae” has the obligation to insure the welfare of all children. This blanket protection of children is activated whenever it is needed (Matter of Humphrey v Humphrey, 103 Misc 2d 175), and once the Family Court has jurisdiction it is empowered to make any appropriate order with regard to custody (Matter of Pierson, 126 AD2d 729). While admittedly the petitioners did not receive notice of this court’s sua sponte order of January 3, 1991, they did receive notice of the Family Court proceedings, and in fact appeared on two different dates and were given an opportunity to be heard.
While it is true that the petitioners sought the return of the child shortly after they returned her to New York, they did not commence any formal proceedings for judicial relief until May and June of 1991 in the Supreme Court, although they *713 had been told as far back as March 13, 1991 by the Family Court Judge that they should apply to vacate the order of this court of January 3, 1991, the same determination the Supreme Court itself made. In the interim, of course, this child has been placed for adoption and the delay in following the proper procedure has not enhanced the petitioners’ case. Unfortunately for them, in returning the child, a series of court actions was precipitated, including the dismissal of the adoption proceeding, transfer of the matter to Family Court, placement of the child with DSS, which in turn has placed the child for adoption with another couple where she has now established a relationship of parent and child for many months. While the petitioners may not have calculated that their act of returning the child to New York would have such irreversible consequences, they could not have blithely concluded that the child placed in an emergency state by their own act would remain in a state of suspended animation pending their decision to again proceed with the adoption. Actually, it is apparent that they may well have calculated such a risk since their affidavit in the Supreme Court file, sworn to October 23, 1991, states "[Linda] did tell [a DSS case worker] that the horror of the situation was that the defenseless child was a victim of the system and that she, as well as we, would have to cope with the separation, mental anguish, and emotional upheaval.”
Finally, the standard to be applied in arriving at a disposition in an adoption proceeding is the best interests of the child (Matter of Donald U, 105 AD2d 875). There being no serious dispute as to the critical facts in this matter, the court finds no basis in law to disturb its order of January 3, 1991, nor would it be in the best interests of the child. The motion to vacate the order and reopen the adoption proceeding is accordingly denied.
The motion to recuse is also denied. There being no necessity for a hearing or the taking of testimony of any court employee, the credibility of such personnel is not in issue. The court has made this determination based solely upon a review of the record. Where a Judge is satisfied that no bias or prejudice exists, the Judge is under an obligation to preside even when challenged (Matter of Robin O., 80 Misc 2d 242; Matter of Natter, 70 Misc 2d 791).